IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE HERRICK GROUP & ASSOCIATES LLC, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| K.J.T., L.P., | : | NO. 07-CV-00628 |
| Defendant | : | |

FINDINGS OF FACTS AND CONCLUSIONS OF LAW

TIMOTHY R. RICE                                                  August 25, 2009
U.S. MAGISTRATE JUDGE

Resolution of this commercial real estate dispute primarily rests on whether the seller,

K.J.T., L.P. ("KJT"), secured from the buyer, the Herrick Group & Assoc. LLC ("Herrick") an

oral modification to a written purchase and sale agreement.  KJT claims the modification

guaranteed lease payments from its two commercial tenants who had prematurely terminated

their leasehold before the scheduled real estate closing with Herrick.  If, as KJT claims, parol

evidence establishes the purchase and sale agreement was modified by the parties to guarantee

the lease payments, Herrick breached the sales contract, forfeited its $325,000 deposit, and is

liable for liquidated damages.  However, absent an enforceable oral amendment on the lease

guarantees, KJT is the breaching party.

A four-day trial commenced on May 27, 2009[1] to present evidence of which party is

responsible for the failed November, 2005 sale of Washington Towers, a $6.5 million building in

the heart of the Reading, Pennsylvania business district.  KJT claims the deal failed when

Herrick's plan to resell, or "flip," the property to a third entity, NR Properties ("NR"), unraveled

---

[1]  Transcripts of record from the trial held May 27, 2009 though May 29, 2009, and June
4, 2009, will be reference herein as May 27 Transcript, May 28 Transcript, May 29 Transcript,
and June 4 Transcript.

after NR's bank refused to provide necessary mortgage financing.  See Defendant-

Counterclaimant K.J.T., L.P.'s Proposed Findings of Fact and Conclusions of Law at ¶ A.107-17,

The Herrick Group & Assoc. LLC., v. K.J.T., L.P., No. 07-0628 (E.D. Pa. filed June 29, 2009)

[hereinafter Defendant's Findings of Fact].  Although NR initially sued Herrick in New York

over the botched deal, the two parties joined forces through a litigation agreement[2] to pursue

Herrick's claim against KJT.  See Defendant's Exhibit 91.[3]  Herrick and NR now allege KJT

attempted to conceal the loss of the building's commercial tenants and then failed to secure

Herrick's oral agreement to address the loss of rental income Herrick had planned to receive as

part of its purchase.[4]  See Proposed Findings of Fact and Conclusions of Law Submitted by the

Plaintiff, the Herrick Group, LLC at 31, at  ¶24, The Herrick Group & Assoc. LLC v. K.J.T.,

_____

[2]  Pursuant to the Litigation Agreement, Herrick agreed to "commence an action against KJT in the appropriate Court in Pennsylvania . . . asserting all colorable claims against KJT in connection with the Contract for sale of the Property."  See Defendant's Ex. 91.  Herrick agreed to retain "competent counsel," and pay "[a]ll costs, attorney's fees, expenses and disbursements associated with, and incurred in connection with commencing, filing and serving the PA Action and continuing the PA Action through the completion of the Fed. R. Civ. P. 26 automatic disclosure rule."  Id.  NR agreed to pay the costs of the PA Action "following completion of the Initial Proceedings."  Id.  The action was commenced solely for NR's benefit.  Id.  NR agreed to discontinue the NY action if the PA action settled with the written consent of NR or the PA action resulted in "a non-appealable judgment or agreement in favor of [Herrick]."  Id.  If the parties did not settle with the consent of NR, or the PA action did not result in a judgment in favor or Herrick, NR had the right to continue and pursue the NY action.  Id.  The parties have raised no challenge to the propriety of this agreement, and the issue is not before me.

[3]  All exhibits referenced herein are the trial exhibits from the May 27, 2009 through May 29, 2009, and June 4, 2009 trial in The Herrick Group & Assoc. LLC v. K.J.T., L.P., No. 07-628 (E.D. Pa.).

[4]  In addition, Herrick alleges other material breaches by KJT, including failure to disclose a mechanics lien against the property and failure to disclose the theft of gas at the property, which I find were either immaterial or had been resolved by the parties before the scheduled closing in November, 2005.

L.P., No. 07-628 (E.D. Pa. filed June 29, 2009).

Based on the findings of fact and conclusions law set forth below, I will enter judgment in favor of Herrick because KJT breached the Purchase and Sale Agreement.  Although it is a close question whether KJT secured from Herrick a binding oral modification to guarantee the lease payments, KJT's evidence of the modification falls short of the "clear, precise, and convincing evidence" required to prove such amendments.  See Brinich v. Jencka, 757 A.2d 388, 399 (Pa. Super. Ct. 2000) (quoting Somerset Comm. Hosp. v. Allan B. Mitchell & Assoc., Inc., 685 A.2d 141, 146 (Pa. Super. Ct. 1996)).  KJT may have subjectively believed it had addressed Herrick's concerns on the eve of closing, but the relevant correspondence among the parties establishes the topic of lease guarantees remained a disputed issue until negotiations ended.  See Plaintiff's Exhibit 54, Silberberg November 15, 2005 Letter to Heller; Plaintiff's Exhibit 56, Heller Reply Letter to Silberberg dated November 21, 2005; Defendant's Exhibit 71, November 21 email chain.

This case features significant credibility questions and self-interest on both sides, and I have relied on the documentary corroboration to resolve the conflicting testimony.  Given the importance of the lease issue and the significant impact rental income had on the purchase price, I find KJT would have memorialized–in writing–an amendment concerning the lease guarantees. Accordingly, I discredit the testimony of KJT's witnesses on this issue.

KJT failed to avail itself of ample opportunities to obtain a written amendment.  For example, on November 15, 2005, the eve of the scheduled closing date, Herrick's attorney, Michael Silberberg, Esquire, cited the lease guarantee as an ongoing dispute.  See Plaintiff's Exhibit 54.  In response, on November 21, 2005, when the parties were attempting to resurrect

3

the November 16, 2005 or November 17, 2005 closing, Mervin Heller, Esquire, KJT's attorney, sent a letter to Silberg discussing myriad other issues but failing to allege the existence of the alleged oral modification on the lease issue.  See Plaintiff's Exhibit 56.  Therefore, I credit the testimony of witnesses representing Herrick and NR who stated KJT merely offered lease guarantees.  See May 27 Transcript at 104:16-21, 119:14-16; May 28 Transcript at 97:7-13, 101:1-9, 102:6-12, 105-107.  Their testimony is corroborated by written correspondence.  To the extent Heller claims Silberg admitted he wrote the November 15, 2005 letter only as a pretext to protect Herrick's legal position, I discredit Heller.  As an experienced real estate practitioner, Heller would have taken the necessary steps to remedy such a tactic, or at the least, objected and cited the existence of the pivotal oral agreement he claims the parties already had reached.

I.      Findings of Fact

A.      KJT and Washington Towers

1.  KJT owns a property located in Reading, Pennsylvania commonly known as Washington Towers.  Timo, Inc. is the general partner of KJT and Kevin Timochenko is the president of Timo, Inc.  See May 29 Transcript at 3:18-25, 6:21-25, 7:1-5.

2.  Washington Towers consists of commercial space and 92 residential apartment units. See id. at 126:1-2.  KJT purchased Washington Towers in 1997, id. at 126:14-15, and thereafter invested an additional $500,000 to $600,000 for improvements, id. at 126:19-21.

3.  Metropolitan Management Group Inc. ("MMG") is an affiliate of KJT and manages Washington Towers.

4. City-Mart Stores, LLC ("City-Mart") was a grocery store that entered into a five-year lease for commercial space at Washington Towers commencing on March 1, 2005.  See

Plaintiff's Exhibit 16, Lease Agreement for Commercial Office Space in Washington Towers dated March 1, 2005 and executed by KJT as landlord and City-Mart as tenant [hereinafter City-Mart Lease].

5.   A second commercial tenant, Integral Wireless Solutions Inc. ("Integral"), leased two commercial spaces at Washington Towers.  The lease on the first space ran from February 1, 2002 through April 3, 2007.  See Plaintiff's Exhibit 26, Lease Agreement for Commercial Office Space in Washington Towers dated February 1, 2002, and executed by KJT as landlord and Integral as tenant at ¶ 2 [hereinafter 2002 Integral Lease].  The lease on the second space ran from November 1, 2003 through April 31, 2007.  See Plaintiff's Exhibit 27, Lease Agreement for Commercial Office Space in Washington Towers dated November 3, 2003 and executed by KJT as landlord and Integral as tenant at ¶ 2 [hereinafter 2003 Integral Lease].

B.   <u>Herrick, Bruce Graeber, Jacob Elbogen, and Michael Silberberg, Esq.</u>

6.   Herrick is a Nevada limited liability company with a principal place of business at 445 Central Avenue, Cedarhurst, New York 11516.  See Plaintiff's Exhibit 46, Articles of Organization of The Herrick Group LLC filed with the Secretary of State of Nevada on January 25, 2001; May 27 Transcript at 12:18-21; Stipulated Facts at ¶ 1, <u>The Herrick Group & Assoc. LLC v. K.J.T., L.P.</u> No. 07-0628 (E.D. Pa. filed May 27, 2009) [hereinafter Stipulated Facts].

7.   Bruce Graeber is the sole member of Herrick.  See May 27 Transcript at 21:2-3; Stipulated Facts at ¶ 2.

8.   Graeber and Jacob Elbogen are business partners who buy and sell commercial real estate, often engaging in what are commonly referred to as "flip transactions."  See May 27 Transcript at 32:13-23; 23:14-18, 60:7-12.

5

9.  Third Party Defendant Silberberg served as Graeber's attorney in commercial real estate transactions, and represented Graeber, Elbogen, and Herrick in this matter.  <u>See</u> May 27 Transcript at 118:6-7.[5]

10.  Both parties to the Washington Towers deal are sophisticated and experienced real estate professionals.

C.      <u>The Purchase and Sale Agreement</u>

11.  An agreement of sale concerning Washington Towers was negotiated and executed on June 23, 2005 by KJT as seller and Herrick as purchaser.  <u>See</u> Plaintiff's Exhibit 2 and Defendant's Exhibit 4, Purchase and Sale Agreement dated June 23, 2005, by KJT as seller, and Herrick as purchaser [hereinafter Purchase and Sale Agreement]; <u>see also</u> May 27 Transcript at 34:2-7; Stipulated Facts at ¶10.

12.  Herrick's place of incorporation was erroneously listed as New York.  <u>See</u> Transcript at 34:24-25, 35:1-4, 52:7-19.

13.  The error was not intended to mislead KJT.  <u>See</u> May 27 Transcript at 29:14-20; May 29 Transcript at 14:13-16.

14.  The error was not material and the state of Herrick's incorporation was never an issue for Timochenko, nor a matter he investigated.  <u>See</u> May 29 Transcript at 115:12-18.

When it agreed to sell Washington Towers, KJT represented that:

15.  "Every person having the right to occupy any portion of the Property (each a "Tenant"), has such right pursuant to a written Lease.  All of the Leases are in full force and

---

[5]  In a separate opinion I found Herrick has the capacity to sue.  <u>See</u> Memorandum Opinion, <u>The Herrick Group & Assoc. LLC v. K.J.T. L.P.</u>, No. 07-628 (E.D. Pa. filed Aug. 20, 2009).  Therefore, KJT's claims against Silberberg are dismissed as moot.

effect, [KJT] has received no notice of any claim under any Lease and [KJT] has no knowledge of any breach of any Lease." See Purchase and Sale Agreement, supra ¶ 11, at ¶ 4(b).

16. "Each Tenant is in actual possession of its leased premises." Id.

17. As to each tenant lease, "the Lease is valid and in full force and effect strictly in accordance with its terms and has not been modified, in writing or otherwise; . . . there has been no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default, on the part of the Tenant or the lessor thereunder, and the Tenant has not asserted and has no defense to offset or claim against, its Rent or the performance of its other obligations under the Lease; . . . [KJT] has no reason to believe that the Tenant or any guarantor of a Lease is or may become unable or unwilling to perform any of its obligations under the Lease for any reason . . . ." Id.

18. It has "good and marketable title to the Property to be insured as such by a reputable title insurer . . . at standard rates, free and clear of all mortgages, liens, claims, judgments, encumbrances . . . and any other matters affecting title . . . ," and that KJT would be able to convey and transfer such title at closing. Id.

19. "All water, sewer, gas, electric, telephone, and other public utilities . . . are installed, connected and operating, in good condition, with all installation and connection charges paid in full . . . ," and that "[n]o moratorium, proceeding or other fact or condition exists which threatens to impair continued furnishing of such services to the Land at regular rates and fees . . . ." Id.

20. The above referenced covenants, representations and warranties of KJT were certified as true both at the time of the signing of the Purchase and Sale Agreement and at the time of the closing of the proposed sale. Id.

21.  KJT promised "[f]rom and after the Effective Sale until the Closing . . . [KJT] will promptly notify [Herrick] in writing of any litigation or governmental proceeding to which [KJT] becomes a party or which affects the Property or any part thereof."  See Purchase and Sale Agreement, supra ¶ 11, at ¶4(c); see also May 28 Transcript at 157:2-6; 159:11-23.

22.  The Purchase and Sale Agreement also placed Herrick on notice it could not rely on any disclosures concerning gas usage at the property.  Specifically, paragraph 20(p) of the Purchase and Sale Agreement advised Herrick the gas company had taken the position "that gas usage has been understated, and that in fact there is a higher usage at the Premises than was indicated on the metering system contained at the Premises.  Seller makes no representation or warranty as to actual gas usage . . . ."  See Purchase & Sale Agreement, supra ¶ 11, at ¶ 20(p).[6]

23.  The Purchase and Sale Agreement also provided: "This Agreement, including all exhibits attached hereto and documents to be delivered pursuant hereto, shall constitute the entire agreement and understanding of the parties, and there are no other prior or contemporaneous written or oral agreements, undertakings, promises, warranties, or covenants not contained herein."  See id. ¶ 20(a).

24.  The Purchase and Sale Agreement Sale also provided: "This Agreement may be

---

[6]  Herrick was aware prior to execution of the Purchase and Sale Agreement that it could not rely on disclosures concerning gas usage. Specifically, Timochenko advised Graeber that the gas company was investigating gas usage and further advised Graeber that gas usage would be higher than shown on the gas bills. Timochenko told Graeber he should use figures of approximately $60,000 when considering the property, rather than the figures of approximately $45,000 reflected on the gas bills.  See May 29 Transcript at 129-31.

Further, earlier marketing materials for the sale of Washington Towers prepared on Timochenko's behalf listed gas usage at the actual, $60,000 figure.  See Defendant's Exhibit 164, Kislak Work-Up; May 29 Transcript at 133-34.  Timonchenko was subsequently convicted of fraud for his role in stealing the gas.  See Plaintiff's Exhibit 35, Arraignment and Guilty Plea Hearing Transcript, United States v. Timochenko, No. 06-00179 (E.D. Pa. held May 5, 2006).

amended only by a written memorandum subsequently executed by all of the parties hereto." See id. ¶ 20(b); see also May 28 Transcript at 24:19-24, 155:9-25, 156:6-14.

25. Paragraph 21 of the Purchase and Sale Agreement provides in pertinent part:

ESTOPPEL

(a) [KJT] shall use its best efforts to deliver to [Herrick] at least ten (10) days prior to the Closing Date, Estoppel Letters[7] dated not more than thirty (30) days prior to the Closing Date with respect to the Commercial Leases at the Premises (the "Estoppel Letters"). If [KJT] has failed to deliver such Commercial Estoppel Letters, then [Herrick] shall either (i) accept the Estoppel Letters delivered, and the parties shall proceed to Closing without abatement in the Purchase Price subject and pursuant to the other terms of this Agreement, or (ii) notify [KJT] in writing not less than three (3) days prior to the Closing Date of such insufficiency, thereupon [KJT] shall have ten (10) days after receipt of such notice to deliver such Estoppel Letters, and Closing shall be extended to the extent necessary. If [KJT] fails to deliver the Estoppel Letters within such ten (10) day period, then, unless [KJT] delivers the Estoppel Letter's (sic) executed by [KJT] to [Herrick] which Estoppel Letters shall be guaranteed by principals of [KJT]. [sic] [Herrick] shall have the right to terminate this Agreement by giving written notice to [KJT] on or before such Closing Date as so extended. If [Herrick] duly exercises such right of termination, Escrow Agent shall return the Deposit including all interest thereon to [Herrick] and this Agreement shall be null and void . . . . If [Herrick] does not exercise such right to terminate this Agreement [Herrick] shall be deemed to have waived its right to do so and Closing shall occur as described in this Agreement . . . .

The Estoppel Letters referred to hereinabove (including [KJT's] Estoppel Letters) shall confirm that the Lease is unmodified (or state the modification) and in full force and effect, subordinate to any present and/or future financing covering the Premises, the dates to which rent and other charges have been paid, and state that [KJT] is not in default of the Lease . . . .

Purchase and Sale Agreement, supra ¶ 11, at ¶ 21.

26. In the case of a breach by KJT, Herrick is entitled, among other things, to cancel the Purchase and Sale Agreement and the return of any deposit paid with interest and other expense

---

[7] An estoppel letter or certificate is "[a] signed statement by a party (such as a tenant or mortgagee) certifying for another's benefit that certain facts are correct, as that a lease exists, that there are no defaults, and that rent is paid to a certain date." Black's Law Dictionary 591 (8th ed. 2004).

9

reimbursement.  Id. ¶ 15(b).  In the case of a breach by KJT requiring a litigated remedy, Herrick is entitled to its attorney's fees and cost.  Id. ¶ 20(m).

D.    The Due Diligence Period and Closing Date

27.  Elbogen was primarily responsible for Herrick's due diligence concerning Washington Towers.  See June 4, 2009 Transcript at 83:18-22.

28.  Herrick had 45 days to complete its due diligence of the property.  See Purchase & Sale Agreement, supra ¶ 11, at ¶¶ 5-6.  It was agreed the closing would occur within 30 days of the expiration of the due diligence period.  Id. ¶ 12(b).

29.  The due diligence period and the closing date were continued a number of times: once in return for the payment of an additional deposit of $50,000, and the other times without charge.  See Plaintiff's Exhibit 5, Letter dated August 8, 2005 from Silberberg to Heller; Plaintiff's Exhibit 6, Letter dated August 25, 2005 from Silberberg to Heller; Plaintiff's Exhibit 8, Letter dated September 20, 2005 from Heller to Silberberg; see also May 27 Transcript 43-45; May 28 Transcript 23-24; Stipulated Facts at ¶ 16.

30.  KJT or authorized representatives of KJT consented to each extension.  See May 27 Transcript at 43:25, 44:1, 15-17; 45:6-9; May 28 Transcript at 24:1-9, 90:14-22; May 29 Transcript at 138:1-7; June 4 Transcript at 93:9-10.

31.  Ultimately, the closing was to occur on either November 16, 2005 or November 17, 2005 ("closing date").  See Plaintiff's Exhibit 8, Letter dated September 20, 2005 from Heller to Silberberg; Stipulated Facts at ¶ 17.

32.  Elbogen requested Timochenko continue to manage the property following the closing, and Timochenko agreed.  See Defendant's Exhibit 52, November 11, 2005 email from

Elbogen to Deb Houck, Timochenko's assistant; May 29 Transcript at 171-73.

E.    Amendments to the Agreement of Sale

33.   Apart from the extensions referenced above, which were in writing and signed by the party charged with the contract change, see Findings of Fact 29-30, the parties also entered into a letter agreement making four additional changes to the Purchase and Sale Agreement ("Letter Amendment"), see Plaintiff's Exhibit 3, Letter Amendment [hereinafter Letter Amendment]; see also May 27 Transcript at 39-40; May 28 Transcript at 20-21.  No change addressed the lease guarantee.

34.   The Letter Amendment was dated August 30, 2005 and signed by the attorneys of both Herrick and KJT.  See Letter Amendment, supra ¶ 33; May 27 Transcript at 40:4-23; May 28 Transcript at 19:3-14.

35.   Among the changes made to the Purchase and Sale Agreement was a change in paragraph 2 of the Letter Amendment permitting Herrick to assign its rights to an unrelated third party: "Paragraph 20(g) is amended to reflect that [Herrick] may assign the Contract to any party or entity. . . ."  See Letter Amendment, supra ¶ 33; see also May 28 Transcript at 21:11-25, 22:1-4; May 29 Transcript at 27:4-7; Stipulated Facts at ¶19.  This put KJT on notice Herrick had the option to flip the property to a second buyer.

36.   On or about August 31, 2005, Herrick assigned its rights under the Purchase and Sale Agreement to NR.  See Plaintiff's Exhibit 4, Agreement of Assignment dated on or about August 31, 2005 between Herrick and NR [hereinafter Assignment Agreement].

37.   Another change at paragraph 4 of the Letter Amendment provided for the removal of paragraph 20(p) of the Purchase and Sale Agreement, involving the gas usage issue.  See Letter

11

Amendment, <u>supra</u> ¶ 33.; <u>see also</u> May 27 Transcript at 41:15-24; May 29 Transcript at 27:10-13.

38.  There are no other written amendments to the Purchase and Sale Agreement.  <u>See</u> May 28 Transcript at 24:15-18.

F.    <u>The Deposit</u>

39.  NR paid over to Herrick sufficient monies to cover all deposits required under the Purchase and Sale Agreement.  <u>See</u> May 28 Transcript at 89:1-3, 90:11-13; Stipulated Facts at ¶ 24.

40.  Herrick, in turn, deposited with KJT and/or its agent the total sum of three hundred twenty-five thousand dollars ($325,000.00) (the "deposit") in connection with the contemplated sale.  <u>See</u> Plaintiff's Exhibit 9, Deposit drafts; <u>see also</u> KJT response to ¶¶ 17-18 of the Amended Complaint; May 28 Transcript at 25:10-23, 90:11-13.

41.  The deposit is held by KJT's attorneys, the Leisawitz Firm.  <u>See</u> Stipulated Facts at ¶ 26.

G.    <u>The Anchor Tenant</u>

42.  City-Mart was the principal commercial tenant at Washington Towers at the time of the execution of the Purchase and Sale Agreement.  <u>See</u> May 29 Transcript at 7:20-25, 8:1-6, 10:21-25; Stipulated Facts at ¶ 27.

43.  The City-Mart lease was for five (5) years, commencing on March 1, 2005 and ending on February 28, 2010.  <u>See</u> City-Mart Lease, <u>supra</u> ¶ 4, at ¶ 2.

44.  City-Mart agreed to a rent determined by an annual sliding scale beginning at $6,594 per month for the first year of the lease and ending at $7,421.58 per month for the final year of the lease (not including other items of additional rent).  <u>Id.</u> ¶ 3.

45.  By executing the lease, City-Mart expressly agreed, among other things, not to abandon the property.  Id. ¶ 18.

46.  There is no provision for rent abatement, free rent, or other landlord rent concession in the City-Mart lease.  Id.

H.     The Other Major Commercial Tenant

47.  The only other commercial tenant in residence at Washington Towers at the time of the execution of the Purchase and Sale Agreement (apart from roof antenna lessors) was a technology business, Integral.  See 2002 Integral Lease, supra ¶ 5, at ¶ 1; 2003 Integral Lease, supra ¶ 5, at ¶ 1; May 29 Transcript at 7:20-25, 8:1-6, 10:21-25; Stipulated Facts  at ¶ 29.

48.  The 2002 Integral lease was for five (5) years and three (3) months, commencing on February 1, 2002 and ending on April 30, 2007.  See 2002 Integral Lease, supra ¶ 5, at ¶ 2.  The 2003 Integral lease was for three (3) years and six (6) months, commencing on November 1, 2003 and ending on March 31, 2007.  See 2003 Integral Lease, supra ¶ 5, at ¶ 2.

49.  Pursuant to the 2002 Integral lease, Integral agreed to rent determined by an annual sliding scale beginning at $2,484 per month for the first year of the 2002 Integral Lease and $2,759 per month thereafter (not including other items of additional rent).  See 2002 Integral Lease, supra ¶ 5, at ¶ 3.

50.  Pursuant to the 2003 Integral lease, Integral agreed to a rent of $2,988 for the entire term of the 2003 Integral lease (not including other items of additional rent).  See 2003 Integral Lease, supra ¶ 5, at ¶ 3.

51.  By executing the Integral leases, Integral expressly agreed, among other things, not to abandon the property.  See 2002 Integral Lease, supra ¶ 5, at ¶ 8; 2003 Integral Lease, supra ¶ 5,

at ¶ 8.

52.  There is no provision for rent abatement, free rent, or other landlord rent concession in either Integral lease.  Id.

I.     Tenant Estoppels

53.  On October 12, 2005, and again on October 14, 2005, Herrick sent form estoppel certificates to KJT and requested they be signed by City-Mart and Integral.  See Plaintiff's Exhibit 14, Facsimile dated October 12, 2005 from Silberberg to Heller; Plaintiff's Exhibit 10, Letter dated October 14, 2005 from Silberberg to Heller; see also May 28 Transcript at 29:21-25, 30:1-4.

54.  KJT made no effort to secure estoppels signed by City-Mart or Integral until after Timochenko had signed the landlord estoppels.  See Grey Affidavit at ¶¶ 8-9; May 28 Transcript at 137:12-13, 138:5-22; May 29 Transcript at 38-39,76-79; see also, e.g., Plaintiff's Exhibit 28, Letter from MMG to counsel for Integral dated November 2, 2005 (dated two days after the landlord estoppels were signed, requesting that Integral add the signature of its representative to the existing landlord estoppel).

55.  The landlord estoppels contain several critical representations including, but not limited to: (1) the continuing validity of the lease; (2) the payment in full of all rent and other charges due as of the date of the landlord estoppel; (3) the absence of any demand by the landlord for payments due; (4) the absence of any default under the applicable lease by the landlord; and (5) the absence of any rent concession, abatement, set-off or other claim by the commercial tenant against the landlord.  See Plaintiff's Exhibit 15, Landlord Estoppels.

J.      The State of Affairs of City-Mart Known to KJT

56.   When the landlord estoppels were executed, KJT knew that City-Mart owed rent.
See Plaintiff's Exhibit 22 ("[W]e note that you were provided with notice of payment default for
several months, and failed to properly cure the respective defaults within the time provided.");
Plaintiff's Exhibit 17, Rent Histories prepared and produced by KJT specifically for this
litigation (identifying late, missed and partial rent payments, and missed additional rent
payments); Plaintiff's Exhibit 63, Answer to GT Interrogatory no. 11 (referring to missed
payments); May 29 Transcript at 45-49, 53:13-22, 60:14-16 (Timochenko disputes none of the
City-Mart defaults listed in Mr. Heller's letter identified as Plaintiff's Exhibit 22), 61:1-11.

57.   After the landlord estoppels were executed by Timochenko, but prior to the closing
date, City-Mart abandoned its leased premises in Washington Towers and ended its tenancy
prematurely.  See Plaintiff's Exhibit 21, Reprint of Reading Eagle article dated November 10,
2005; May 27 Transcript at 46:5-10; May 28 Transcript at 43:4-20, 143:1-19.[8]

58.   No writing exists from KJT to Herrick disclosing any of the facts concerning
City-Mart's true state of affairs.  See May 27 Transcript at 46:23-25, 47:1; May 28 Transcript at
183:21-25.

_____

[8] KJT was also aware: (1) City-Mart had failed to pay a contractor, resulting in a
$254,928 mechanic's Lien against the Property, see Plaintiff's Exhibit P19, Notice of Mechanic's
Lien; Plaintiff's Exhibit 43, Mechanic's Lien; see also, May 28 Transcript at 34:14-25, 35, 36:1-
17; May 29 Transcript at 65:18-23, 60:14-16 (Timochenko disputes none of the City-Mart
Defaults listed in Mr. Heller's letter identified at Plaintiff's Exhibit 22); (2) City-Mart had failed
to pay a separate contractor thus resulting in the filing of a lawsuit seeking $260,170.45 from
both City-Mart and KJT, see Plaintiff's Exhibit 18, Ciatto Construction lawsuit; see also May 28
Transcript at 38-40, 161:1-9; May 29 Transcript at 58:15-25, 59, 60:14-16; 66:8-25, 67:1-12; and
(3) City-Mart had received payment demands or default notices from KJT or its representatives,
see Plaintiff's Exhibit 22 ("We note that you were provided with notice of payment default for
several months . . . ."); see also May 29 Transcript at 56:10-17, 60:14-16.

K.     The State of Affairs of Integral Known to KJT

59.  KJT and/or its representatives knew, at the time the landlord estoppels were executed, that Integral had abandoned its leasehold.  See Gray Affidavit at ¶ 6; see also Plaintiff's Exhibit 28, November 2, 2005 letter from MMG to counsel for Integral (requiring Integral to heat its abandoned space in order to prevent the pipes from freezing); May 28 Transcript at 178:19-25, 179:1-20; May 29 Transcript 72-74, 75:7-25, 76:1-13, 79:3-10, 80:17-25, 81:1.

60.  KJT and/or its representatives knew, at the time the landlord estoppels were executed, that Integral owed gas, water, and parking fees.  See Plaintiff's Exhibit 29, Certified Complaint in Confession of Judgment by KJT against Integral, Court of Common Pleas, Berks County, Docket no. 06-12523, at Exhibit "C" (Complaint and Exhibit "C" to the complaint only), (referring to missed payments); see also May 29 Transcript at 69:5-25, 70:1-22, 80-81.

61.  Herrick knew nothing of Integral's abandonment of its leasehold.  See May 27 Transcript at 108:3-15; May 28 Transcript at 46:17-22, 124:6-13; May 29 Transcript at 72:13-15; June 4 Transcript at 104:6-14, 142:12-18.

L.     KJT Breaches the Contract

62.  In an investment property, the rental stream from a commercial tenant is a major component of the property's value.  See May 27 Transcript at 46:5-21, 162-64; June 4 Transcript at 20:23-25, 21:1-12, 94:1-8.  The rental stream was an important factor in Herrick and NR's decision to purchase Washington Towers.  See May 27 Transcript at 46:11-21; June 4 Transcript at 20:23-25, 21:1-12.

63.  Although KJT failed to disclose the precarious condition of City-Mart to Herrick until City-Mart had vacated the premises, City-Mart's failure became known to Herrick prior to

the scheduled closing.  See May 27 Transcript at 46-49; May 28 Transcript at 43:21-25, 44:1.

64.  As of November 16, 2005 and November 17, 2005, the following KJT representations contained in the Purchase and Sale Agreement could not have been true: (i) City-Mart's lease would be "in full force and effect," (ii) KJT would have "received no notice of any claim under any Lease," (iii) KJT would have "no knowledge of any breach of Lease," (iv) City-Mart would be "in actual possession of its leased premises," (v) City-Mart's lease "is valid and in full force and effect strictly in accordance with its terms and has not been modified, in writing or otherwise," (vi) in regard to the City-Mart lease, "there has been no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default, on the part of [City-Mart]," and (vii) KJT "has no reason to believe that [City-Mart] or any guarantor of a Lease is or may become unable or unwilling to perform any of its obligations under the Lease for any reason . . . ."  See Purchase and Sale Agreement, supra ¶ 11, at ¶ 4(b); see also May 27 Transcript at 125-27; May 29 Transcript at 110:6-13; June 4 Transcript at 93:12-20, 139-41.  Thus, KJT breached the Purchase and Sale Agreement.

65.  Despite KJT's failure to disclose the leasehold abandonment of Integral to Herrick until after the start of this litigation, that abandonment likewise was a breach of the Purchase and Sale Agreement.  See Findings of Fact 62-64; see also May 28 Transcript at 125-27; June 4 Transcript at 141:5-8.

66.  As of November 16, 2005 and November 17, 2005, the following KJT representations contained in the Purchase and Sale Agreement could not have been true:  (i) Integral's leases would be "in full force and effect," (ii) KJT would have "no knowledge of any breach of Lease," (iii) Integral would be "in actual possession of its leased premises," (iv)

17

Integral's lease "is valid and in full force and effect strictly in accordance with its terms and has not been modified, in writing or otherwise," (v) in regard to the Integral leases, "there has been no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default, on the part of [Integral]," and (vi) KJT "has no reason to believe that [Integral] or any guarantor of a Lease is or may become unable or unwilling to perform any of its obligations under the Lease for any reason . . . ." See Purchase and Sale Agreement, supra ¶ 11, at ¶ 4(b); see also May 27 Transcript at 125-27; May 29 Transcript at 110:6-13; June 4 Transcript at 93:12-20, 139-141.

M.    Post-Default Efforts to Salvage the Sale Were Unsuccessful

67.   Timochenko learned City-Mart intended to vacate its leasehold no later than Friday, November 11, 2005 when he received a phone call advising him City-Mart had ceased operations and was selling its inventory.  The next day, November 12, 2005, KJT took possession of the City-Mart space and locked City-Mart out of the premises.  See May 29 Transcript at 156-57.

68.   When Timochenko took these actions, he was aware the situation would affect the closing.  Timochenko, a commercial apartment building and real estate professional since 1988, owns, through wholly owned entities, 46 properties and 1,800 units.  See May 29 Transcript at 124-25.  He knew the buyer would inspect Washington Towers before closing and observe City-Mart no longer occupied the space.  See  May 29 Transcript at 157, 160-63.  Indeed, Timochenko was aware an inspector would visit the property over the next few days as a result of a lending bank's environmental investigation.  See May 29 Transcript at 16:16-25.

69.   As a result, Timochenko contacted Graeber on Sunday, November 13, 2005 or

Monday, November 14, 2005 to discuss the issue.[9]  See May 29 Transcript at 163-64.

70.  Herrick became aware City-Mart was no longer occupying the premises no later than November 14, 2005, and did not terminate or consider terminating the Purchase and Sale Agreement upon learning of the vacancy.  See May 27, 2009 Transcript at 77:9-25, 78:1-6. Rather, Graeber tried to keep the deal together.  Id. at 77-78.

71.  After the City-Mart lease issue was in dispute, the parties engaged in negotiations to salvage the sale.  See May 27 Transcript at 47:12-14, 84:14-20; May 28 Transcript at 44:2-25, 45:1; May 29 Transcript at 115:19-22, 117:2-4; June 4 Transcript at 21:13-17, 22:15-25, 23:1-16, 99:2-6.

72.  During the negotiations, the parties discussed Timochenko's offer to guarantee the City-Mart lease.  See, e.g, May 29 Transcript at 111:8-11; May 27 Transcript at 168:13-15, 169:14-23, 170:4-25, 171:23-26; June 4 Transcript at 99:13-24, 102:1-2.

73.  Timochenko is unaware what, if any, collateral he offered as security for his alleged rent guarantee.  See May 29 Transcript at 111:8-11.

74.  Timochenko was unwilling to put any of the alleged guaranteed rent into escrow. See May 29 Transcript at 111:8-11.

75.  As stated by both Meir Cohen, who worked with NR, and Elbogen, Timochenko offered to guarantee the City-Mart rent for only one year, not for the full term of the lease.  See May 27 Transcript at 168:13-15, 169:14-23, 170:4-25, 171:23-26; June 4 Transcript at 99:13-24, 102:1-2.

---

[9]  The earliest Timochenko could contact either Graeber or Elbogen was Sunday, November 13, 2005 because both individuals observe the Sabbath and do not answer telephone calls from sundown Friday until after sundown Saturday.  See May 29 Transcript at 163-64.

76.  As stated by both Arnon Cnaani, NR's principal and president, and Cohen, a rent guarantee was not acceptable to NR.  See May 27 Transcript at 169:14-23; June 4 Transcript at 23-26.  Rather, NR and its lending bank required the money be placed in escrow.  See Defendant's Exhibit 71.

77.  A rent guarantee was just one of the many options explored,[10] and ultimately it was not acceptable to Herrick because it was not acceptable to NR, the ultimate buyer.  See May 27 Transcript at 104:16-21, 119:14-16; May 28 Transcript at 97:7-13, 101:1-9, 102:6-12, 105-07.

78.  There is no writing evidencing a rent guarantee.  See May 27 Transcript at 103:7-10; May 28 Transcript at 183:21-25; May 29 Transcript at 111:6-7, 111:16-18.

79.  In his November 15, 2005 letter to Heller, days after KJT claims to have struck an agreement on a rent guarantee, Silberberg listed a rent guarantee as one of several possibilities to be explored.  See Plaintiff's Exhibit 54, Silberberg November 15, 2005 Letter to Heller [hereinafter November 15 Letter].  Heller's November 21, 2005 response expressed no surprise or confusion, and did not accuse Herrick of reneging on a prior oral agreement.  See Plaintiff's Exhibit 56, Heller Reply Letter to Silberberg dated November 21, 2005 [hereinafter November 21 Letter]; see also May 27 Transcript at 128:14-25.  Heller struggled to explain this inconsistency at trial and ultimately failed to give a plausible explanation.  See May 28 Transcript at 185-91.

80.  KJT cites to a November 21, 2005 email from Elbogen to Timochenko (through Deb

---

[10]  Although Graeber testified Timochencko never offered a rent guarantee, see May 27 Transcript at 102:14-23, his testimony on the issue is not credited because all other members of the transaction recall discussions regarding a possible rent guarantee, see, e.g., May 29 Transcript at 111:8-11; May 27 Transcript at 168:13-15, 169:14-23, 170:4-25, 171:23-26; June 4 Transcript at 99:13-24.

Houck, Timochenko's assistant) as evidence the parties reached an agreement on a rent guarantee that no longer satisfied Herrick or NR.  The email, however, refers to an offer KJT made to NR's bank during a November 21, 2005 conference call.  See Defendant's Exhibit 71, November 21 email chain.  The email, therefore, establishes the negotiations were on-going and no meeting of the minds previously had occurred.

81.  I find statements made by Herrick to NR do not establish Herrick breached its agreement with KJT.  For example:

82.  In a December 1, 2005 letter to William Zaccaria, NR's attorney, Silberg wrote NR "was not in the position to close . . . and [Silberg and Herrick] have been making attempts to work things out with the Seller so as to make [NR's] Lender comfortable."  See Defendant's Exhibit 38.  Silberg terminated the Assignment Agreement stating "it does not appear that [NR] is in the position to close and therefore, is unable to cure its default under the Agreement." Id.  I do not credit Silberg's statements regarding NR's breach because he simultaneously was attempting to claim both NR and KJT, not Herrick, had breached their respective contracts with Herrick.  Moreover, even assuming NR had breached the Assignment Agreement with Herrick, KJT had already breached the Purchase and Sale Agreement when City-Mart and Integral vacated the leased premises before closing.  Aaron Birnbaum, executive vice-president and a founding partner of Meridian Capital Group, broker for NR's mortgage, testified NR's loan did not close because City-Mart had left Washington Towers.  See May 27 Transcript at 142:10-17.  I credit his testimony as unbiased and corroborated by documentary evidence.

83.  In a December 1, 2005 email to Cnaani, Graeber stated Herrick was "officially in default with [KJT]."  See Defendant's Exhibit 112.  However, Graeber's statement is not credited

21

because he was attempting to convince Cnaani to close on the real estate deal.

84.   Despite Timochenko's claim he was "ticked off" the alleged rent guarantee deal was reneged upon, the record is devoid of any letter or email of protest, complaint or accusation from anyone on KJT's behalf.  See May 29 Transcript 186-89.

N.      Ignored Demand

85.   Because the parties were unable to negotiate a resolution of the City-Mart default, Herrick was entitled to cancel the Purchase and Sale Agreement and the return of the deposit. See supra Findings of Fact 25.

86.   Herrick demanded the return of the deposit on November 22, 2005.  See Plaintiff's Exhibit 58, Letter dated November 22, 2005 from Silberberg to Heller; see also May 28 Transcript 26:18-22, 27:13-14, 28:15-17.

87.   KJT refused to return the deposit, triggering this litigation.  Id.; May 29 Transcript at 200:13-15.

II.      Conclusions of Law

A.      Contract Conclusions of Law

1.   Herrick and KJT agree Pennsylvania law applies in this diversity action.

2.   The Purchase and Sale Agreement is clear and unambiguous.  See In re Lucent Death Benefits ERISA Litig., 541 F.3d 250, 255 (3d Cir. 2008).

3.   "[W]here the words of the document are clear and unambiguous, [I] must 'give effect' to the language."  Tindall v. Friedman, 970 A.2d 1159, 1165 (Pa. Super. Ct. 2009).

4.   To establish a breach of contract claim, "the plaintiff must allege '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3)

resultant damages." <u>Ocasio v. Prison Health Servs.</u>, 2009 WL 2104488, at *2 (Pa. Super. Ct.

July 17, 2009) (quoting <u>CoreStates Bank N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct.

1999)); <u>accord</u> <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003).

    5.  Where a breach is material, the non-breaching party is entitled to suspend

performance.  <u>Joseph T. Ryerson & Son, Inc. v. Kasgro Rail Corp.</u>, 2008 WL 4155025, at *13

(W.D. Pa. Sept. 8, 2008) (citing <u>Widmer Eng'g, Inc. v. Dufalla</u>, 837 A.2d 459, 467-68 (Pa.

Super. Ct. 2003)).[11]

    6.  The misidentification of a party to a contract is not fatal when the actual party to the

contract is apparent.  <u>See, e.g.</u>, <u>Berks & Dauphin Turnpike Rd. v. Myers</u>, 1820 WL 1885 (Pa.

May, 1820) ("a departure from the strict style of the corporation will not avoid its contract, if it

substantially appear, that the particular corporation was intended"); <u>Curtis G. Testerman Co. v.</u>

<u>Buck</u>, 667 A.2d 649, 652 (Md. 1995) (citing William M. Fletcher, Fletcher Cyclopedia of the

Law of Private Corporations, § 3014, at 149 (perm. rev. ed. 1988) ("A mistake in setting out the

---

[11]  To determine whether a breach is material, I must consider:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

<u>Carriage House Condo. GP, Inc. v. Deraimo</u>, 2008 WL 2683113, at *2-3 (E.D. Pa. July 8, 2008) (Kauffman, J.) (quoting <u>Restatement (Second) of Contracts § 241</u>); <u>accord</u> <u>Widmer Eng'g, Inc.</u>, 837 A.2d at 467.

name of a corporation in an instrument is not fatal where the identity of the corporation is apparent.") and other authorities therein).  Therefore, the misidentification of Herrick in the contract is not fatal.

7.  The preponderance of the evidence shows KJT materially breached the Purchase and Sale Agreement when City-Mart, the anchor commercial tenant at Washington Towers, ceased operations and abandoned its leasehold prior to the closing date of the proposed sale of Washington Towers.  See supra Findings of Fact, at ¶ 56-58, 62-64; Purchase and Sale Agreement, supra Findings of Fact ¶ 11.

8.  The preponderance of the evidence shows KJT materially breached the Purchase and Sale Agreement when the other principal commercial tenant, Integral, abandoned its leasehold prior to the closing date of the proposed sale.  See Findings of Fact, at ¶ 59-61, 62, 65-66; Purchase and Sale Agreement, supra Findings of Fact ¶ 11.

9.  The preponderance of the evidence shows KJT materially breached the Purchase and Sale Agreement when it submitted tenant estoppels signed by KJT that were knowingly false because KJT knew City-Mart owed rent.[12]  See supra Findings of Fact at ¶¶ 56-57.

10.  When KJT breached the Purchase and Sale Agreement, Herrick became entitled to the full refund of the deposit in the amount of $325,000.  See Purchase and Sale Agreement, supra Findings of Fact ¶ 11; see also Joseph T. Ryerson & Son, Inc., 2008 WL 4155025, at *13.

---

[12]  KJT contends Herrick had to object to the tenant estoppels within ten days.  See Defendant's Proposed Findings of Fact at ¶¶ 74-78.  Although Herrick was required to object to the estoppel letters if the letters were insufficient, see Purchase and Sale Agreement, supra Findings of Fact ¶ 11, at ¶ 21, it cannot be required to object to letters containing false information not apparent from the face of the estoppel.

B.     Oral Modification to the Contract

11.   The parties' discussions following the loss of City-Mart were negotiations that never progressed to formation of an oral contract encompassing all material terms and demonstrating an intent by the parties to be bound thereby.  See, e.g., Resolution Trust Corp. as Receiver for Hill Fin. Sav. Ass'n, Red Hill, PA v. Pensignorkay, Inc., 1994 WL 623639, at *2 (E.D. Pa. Nov. 8, 1994) (Gawthrop, J.) (finding no contract because negotiations were ongoing); In re Appliance Store, Inc., 148 B.R. 226, 230-31 (Bankr. W.D. Pa. 1992).[13]

12.   "An agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing.  An oral contract modifying a prior written contract, however, must be proved by clear, precise and convincing evidence."  Brinich v. Jencka, 757 A.2d 388, 399 (Pa. Super. Ct. 2000) (quoting Somerset Cmty. Hosp. v. Allan B. Mitchell & Assoc., Inc., 685 A.2d 141, 146 (Pa. Super. Ct. 1996)); accord ADP, Inc. v. Morrow Motors Inc., 969 A.2d 1244, 1249 (Pa. Super. Ct. 2009) (quoting Fina v. Fina, 737 A.2d 760, 764 (Pa. Super. Ct. 1999)).

13.   KJT, which seeks to prove such an oral agreement, must prove its existence by clear, precise, and convincing evidence.  Middleton v. Realen Homes, Inc., 24 F. Supp. 2d 430, 435 (E.D. Pa. 1998) (Joyner, J.); Empire Props., Inc. v. Equireal, Inc., 674 A.2d 297, 304 (Pa. Super. Ct. 1996).

---

[13]  The statute of frauds does not apply.  Even if not waived by Herrick because it failed to raise the statute of frauds as a defense, see Fed. R. Civ. P. 8(c), the statute of frauds does not apply because the parties seek money damages, not specific performance, see Empire Props., Inc. v. Equireal, Inc., 674 A.2d 297, 302 (Pa. Super. Ct. 1996) (oral contract for the sale of real estate cannot be specifically enforced, but can be the "basis of ran action to recover damages").

14.   KJT failed to meet this burden.  All prior modifications to the Agreement of Sale had been memorialized in writing.  See supra Findings of Fact ¶ 33.  KJT claims the parties reached an agreement that Timochenko would guarantee the rent of the abandoned space, but such agreement was not in writing.  Moreover, when Heller received Silberberg's November 15, 2005 letter, claiming the lease guarantee was one of several options to be discussed, Heller did not refute the claim.  See November 15 Letter, supra Findings of Fact ¶ 79.  Heller's November 21, 2005 response addressed each allegation in Silberberg's letter, except the suggestion no agreement on the rent guarantee had been reached.  See November 15, 2005 Letter, supra Findings of Fact ¶ 79; November 21, 2005 Letter, supra Findings of Fact ¶ 79.  Moreover, a November 21, 2005 email from Elbogen to Timochenko, through Deb Houck, establishes the negotiations regarding the rent guarantee remained ongoing.  See Defendant's Exhibit 91; supra Findings of Fact at ¶ 79.  The subject line of the email read "bank is not ready to close on terms that was [sic] offered this morning," and it discusses a November 21, 2005 telephone conference, in which Timochenko participated.  See Defendant's Exhibit 71.

15.   Accordingly, I will enter judgment in favor of Herrick, and against KJT.[14]

An appropriate order follows.

---

[14]   Because I find KJT breached the Purchase and Sale Agreement when City-Mart and Integral vacated the premises, and because I find KJT and Herrick had not reached an agreement as to a resolution of the City-Mart breach, I need not determined whether KJT further breached the agreement on other grounds or whether Herrick and NR would have been able to proceed to closing because of bank financing issues if such breach had not occurred.